# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 12-206 |
| RYAN SEALS | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Ryan Seals was convicted after a jury trial of being a convicted felon in possession of a firearm. He was apprehended in Philadelphia, with a fully operable, .38 caliber, semi-automatic Star/Boni handgun with an obliterated serial number. Seals was arrested just minutes after he shot at another man, Reginald Gibbons, as Gibbons ran into a residence with several people, including a small child. Because Seals has three prior convictions for possession with intent to deliver narcotics, he is an Armed Career Criminal and faces a mandatory minimum sentence of 15 years. He also has a prior conviction for simple assault, as well as eight other arrests. Those arrests, for crimes ranging from narcotics offenses to attempted murder, were all dismissed or withdrawn. In view of Seals' significant, long-term criminal history, and complete disregard for the safety of other persons, the government recommends a sentence within the advisory guideline range of 262 to 327 months of incarceration.

## I. BACKGROUND

On May 1, 2012, a grand jury charged Ryan Seals in a one-count indictment with being a convicted felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). On November

5, 2012, Seals was convicted by a jury of the one count of being a convicted felon in possession of a firearm.

Pursuant to Section 4B1.4(a) of the Sentencing Guidelines, "A defendant who is subject to an enhanced sentence under the provisions of 18 U.S.C. § 924(e) is an armed career criminal." Section 924(e) provides:

> (1) In the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall be fined under this title and imprisoned not less than fifteen years, and, notwithstanding any other provision of law, the court shall not suspend the sentence of, or grant a probationary sentence to, such person with respect to the conviction under section 922(g).
>
> (2) As used in this subsection—
>
> > (A) the term "serious drug offense" means—
> >
> > > (i) an offense under the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46, for which a maximum term of imprisonment of ten years or more is prescribed by law; or
> > >
> > > (ii) an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)), for 5 which a maximum term of imprisonment of ten years or more is prescribed by law;

## II. SENTENCING CALCULATION

### A. Statutory Maximum Sentence

The statutory maximum sentence for a violation of 18 U.S.C. § 922(g)(1) & 924(c) (possession of a firearm by a convicted felon), is lifetime imprisonment with a mandatory minimum sentence of 15 years, 5 years supervised release, a $250,000 fine, and a $100 special

assessment. Because Seals has three prior convictions for narcotics offenses, he is an Armed Career Criminal and must serve a mandatory minimum sentence of 15 years. Under 18 U.S.C. 53553(a), however, a sentence within the guideline range of 262 to 327 months is appropriate.

### B. Sentencing Guidelines Calculation

The Probation Office correctly calculated Seals's advisory guideline range as follows:

| | |
|---|---|
| Base Offense Level, U.S.S.G. § 2K2.1(a)(2) | 24 |
| Adjustment for shooting at another person, § 2K2.1(b)(6) | +4 |
| Adjustment for obliterated serial number § 2K2.1(b)(4)(B) | +4 |
| Adjusted offense level | 32 |
| Final adjusted offense level | 34 |

The final offense level is 34 pursuant to U.S.S.G. § 4B1.4(b)(3)(A) because Seals used the firearm in connection with a crime of violence when he shot at Reginald Gibbons as Gibbons ran into his girlfriend's home.

Seals has ten criminal history points; eight from his three prior convictions and two because he was on probation at the time of the instant offense. Ten criminal history points would place him in Criminal History Category V. But Seals is in Criminal History Category VI because he used the firearm in connection with a crime of violence by shooting at another man. See U.S.S.G. §4B1.4(c)(2).

## III. ANALYSIS

The Supreme Court has declared that: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 128 U.S. 38, 48 (2007). Thus, the Sentencing Guidelines remain an

indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses.

Once the Court has properly calculated the sentencing guidelines range, the Court must next consider all of the sentencing considerations set forth in 18 U.S.C. 3553(a). A thorough consideration of all of the sentencing factors set forth in 18 U.S.C. § 3553(a) suggests that the most appropriate sentence is one within the advisory guideline range of 18 to 24 months.

### A. Sentencing Factors.

This Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).[1]

---

[1] Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." The Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the "not greater than necessary" language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is

A thorough consideration of all of the sentencing factors set forth in 18 U.S.C. § 3553(a) suggests that the most appropriate sentence in this case is, in fact, one within the advisory sentencing guideline range. There is no unusual circumstance in this case that would warrant any variance below the applicable guideline range of imprisonment. Given that the defendant was in possession of and used a dangerous weapon, a within-guidelines sentence is necessary to reflect the seriousness of the offense, to promote respect for the law, to provide a just punishment, and to deter others who might engage in similar conduct.

B.  Consideration of Sentencing Factors.

(1) The nature and circumstances of the offense, and history and characteristics of the defendant, and (2) the seriousness of the crime.

The first factor under § 3553 is the nature and circumstances of the offense and the history and characteristics of the defendant, and the second is the seriousness of the crime. Seals was convicted of possessing an operable firearm on the streets of Philadelphia. As a convicted felon, he was prohibited from possessing a firearm.

On August 10, 2011, Philadelphia Police Officers John Terry and Robert R. McCuen came upon the scene of a shooting in which the defendant, Ryan Seals, stood on the sidewalk and shot at a man, Reginald Gibbons, who was running into a house. From the porch of that house, Gibbons shot at Seals. On that evening, at approximately 11:45 p.m., Officer McCuen was driving a marked police car north on the 3700 block of North 17th Street. His partner, Officer Terry, was seated in the front passenger seat. Both officers were dressed in full police uniforms. The officers were working the 6 p.m. to 2 a.m. tour of duty in the 39th District.

---

inadequate.'" United States v. Dragon, 471 F.3d 501, 506 (3d Cir. 2006) (quoting United States v. Navedo-Concepcion, 450 F.3d 54, 58 (1st Cir. 2006)).

As the officers reached the intersection of 17th and Butler Streets, in North Philadelphia, Officers Terry and McCuen observed an African-American man (later identified as Bryan Seals, the brother of defendant Ryan Seals) walking west on Butler Street, towards 17th Street. The man turned the corner and continued north, now on the 3800 block of North 17th Street, on the east side of the street (which was the passenger side of the police car). As he was turning the corner, Bryan Seals looked at the uniformed officers in the marked police car, and then he loudly screamed ed up the block, "Yo yo, one time, one time." Officers Terry and McCuen knew that this phrase was a warning to other people that police were in the area.

Immediately after Bryan Seals yelled the warning, Officers Terry and McCuen heard approximately five to eight gunshots from up the 3800 block of 17th Street. When the officers heard the shots, Bryan Seals was behind them. As the officers looked up the block, in the direction of the shots, Officer Terry saw a man, later identified as Reginald Gibbons, on the porch at 3846 North 17th Street, and going into the house. Gibbons' girlfriend, Felicia Chambers, lived in the house along with her mother, Geraldine Trapp, her young daughter, her brother, and her cousin. Ms. Trapp called 911 when Gibbons ran in the house and she said someone was shooting at him.

Just after seeing Gibbons go into the house, the officers saw a man, later identified as the defendant, Ryan Seals, in the front of 3842 North 17th Street, two rowhouses from where they had seen Gibbons. Seals initially had his back to the officers and was facing where Gibbons had run into the house. Officers Terry and McCuen saw Seals fall, get up and turn so that he could now see the officers in their marked vehicle. Seals immediately threw a dark object with some

weight into a large bush next to him. There was no one else near the bush, near Seals, or near the house into which Gibbons had fled.

Seals tried to leave the scene by putting his hands up, and walking towards the uniformed officers saying, "They're shooting." Not seeing anyone else in the immediate area of the shooting, the officers stopped Seals, about four houses from where they had seen him throw the object in the bush. Officer McCuen looked in the bush for the gun.

Officer McCuen found Seals' gun, a .380 caliber semi-automatic, silver Star/Boni handgun with an obliterated serial number (Property Receipt 2983363), in the bush. Officer McCuen made the loaded weapon safe by picking it up and unloading the bullets. He found that the gun was loaded with two rounds of ammunition. After handling the weapon to make it safe, Officer McCuen kept the weapon in his pocket until he turned it over to the assigned detective, Detective Joseph Cremen.

Immediately after the shooting, on the sidewalk in front of 3842 North 17th Street, the place where Officers Terry and McCuen saw Seals throw something in the bush, there were two fired cartridge casings (Property Receipt 2979860). Firearms Examiner Weitman determined that those two fired casings were from Seals' .380 Star/Boni handgun found in the bush.

On the porch of 3844 North 17th Street, the house next to the one that Gibbons ran into, officers found a bullet. Firearms Examiner Weitman determined that the bullet had been fired from the .380 caliber Star/Boni found in the bush. There was also the strike mark of a bullet on the doorframe of the house at 3844 North 17th Street.

On that same night, officers also found a firearm, a .40 caliber semi-automatic, Smith and Wesson, Taurus handgun inside 3846 North 17th Street (Property Receipt 2979858), the house

into which Gibbons had fled. Next door, on the porch of 3844 North 17th Street, officers found two fired cartridge cases for a .40 caliber gun (PR 2979859). Firearms Examiner Weitman determined that those two cartridges were fired from the .40 caliber gun found in the house with Gibbons. Seals committed a serious crime when he possessed a loaded firearm as an armed career criminal. He committed a heinous crime when he fired his pistol at Gibbons and the home of Gibbons' girlfriend and her young child.

Other factors relevant to Seals' character are set forth in the Presentence Report. Seals was raised in an intact family and remains close to both his mother and father. ¶ 55. He has four children and supports two of them. ¶ 59. Seals does not report any significant health issues, substance abuse issues, or mental health problems. ¶ 63, 64. He dropped out of school in the 12th grade, and has not obtained any vocational training. ¶ 65. He worked in several different capacities at a charter school starting in 2008. ¶ 66.

### (3) Specific and general deterrence.

Another factor in the sentencing determination is both specific and general deterrence. Seals' criminal history establishes that prior efforts to reform him have been unavailing. He has continued his criminal behavior throughout the course of his life and appears to be incorrigible. There is nothing in Seals' background or character that warrants leniency. The need to rehabilitate him and to protect the community support the imposition of a sentence within the guideline range of 262 to 327 months of imprisonment.

As the courts of appeals have held, both before and after Booker, deterrence under 3553(a) is not limited to deterrence of the particular defendant. See, e.g., United States v. Eura, 440 F.3d 625, 638 (4th Cir. 2006) (concurring opinion) (referring to the court's consideration of

"the general deterrence factor, § 3553(a)(2)(B)"); United States v. Jordan, 435 F.3d 693, 698 (7th Cir. 2006) (describing how Section 3553(a) "specifies that the court may consider the need for general deterrence and respect for the law"); United States v. Glover, 431 F.3d 744, 751 (11th Cir. 2005) (noting that pre-Booker and post-Booker, "the underlying goals of the statute and the Guidelines are retribution, general deterrence, incapacitation, and rehabilitation" (internal quotation marks omitted)); see also United States v. Yeaman, 248 F.3d 223, 232 (3d Cir. 2001) (referring to Section 3553(a)'s goals of "general deterrence, specific deterrence, retribution, and rehabilitation"). This consideration of general deterrence does not compel a sentence above the guideline range, but it is a persuasive reason for imposing a sentence within that range. Given the prevalence of gun violence in this district, the need to deter others from similar crimes is especially important here, and is an appropriate consideration in choosing a reasonable sentence.

In April 2012, Philadelphia Police Commissioner Charles H. Ramsey stated that "[Philadelphia's] streets are bleeding, and they're bleeding profusely."[2] Indeed, Philadelphia is awash in gun-related crime and violence. From 2002 to 2009, 13,502 individuals were shot in Philadelphia[3] and of those shootings, 2,009 were fatal.[4] Half of these victims were between the ages of 14 and 24.[5]

---

[2] Erica Goode, Police Chiefs Focus on Gun Violence, with an Eye Towards Solutions, N.Y. Times, Apr. 27, 2012 (available at http://www.nytimes.com/2012/04/28/us/police-chiefs-focus-on-disparities-in-gun-violence.html) (last visited June 19, 2012).

[3] See Lindsay Ahlman, et al., Philadelphia Adult Probation and Parole Department, Weapons Related Injury Surveillance System (WRISS) Report 2002-2009: An Analysis of Shooting Incidents, fig.1.1 -1.3 (2010) ("WRISS Report," on file with U.S. Attorney's Office).

[4] See id., fig. 1.1.

[5] See id.

Gunfire causes approximately 85 percent of all homicides.[6] The Philadelphia homicide rate is on the rise; in 2010 there were 244 fatalities caused by firearms,[7] in 2011 there were 318,[8] and from January to April 2012, there were 60 percent more shooting deaths than the same period in the prior year.[9] In the past ten years, firearms have killed approximately five victims each week. On some Philadelphia city blocks, where the chance of getting shot is 1 in 50, gun violence is inescapable.[10]

Philadelphia has the highest per-capita homicide rate of major U.S. cities, with 20.7 killings per 100,000 people.[11] Other major U.S. cities such as Chicago, New York and Los Angeles distantly follow with homicide rates of 15.7, 6.1, and 7.8 per 100,000 people, respectively.[12] Homicides in Philadelphia equal the number of combat deaths in Iraq and three times that of Afghanistan since 2003.[13]

---

[6] Jon Hurdle, Philadelphia Struggles to Quell and Epidemic of Gun Violence, N.Y. Times, Apr. 15, 2007 (available at http://www.nytimes.com/2007/04/15/us/15philadelphia.html) (last visited June 20, 2012).

[7] Mohana Ravindranath, City Welcome Truck Tour for Gun-Law Change, Philadelphia Inquirer, Feb. 19, 2011 (available at http://articles.philly.com/2011-02-19/news/28611754_1_gun-laws-gun-violence-mayors-against-illegal-guns) (last visited June 20, 2012).

[8] John Duchneskie and John Tierno, Two Cities, One Deadly Year, Phila. Inquirer, Jan. 18, 2011 (available at http://crab.rutgers.edu/~ccoe/courses/indsoc/Images/2011_homicides_map-2.pdf) (last visited June 20, 2012).

[9] Morgan Zalot, Community Desensitized to Violence That has Torn Up Neighborhoods, June 19, 2012, 7:00 AM, Phila. Daily News (available at http://www.philly.com/philly/news/Phillys_murder_epidemic.html?cmpid=124488459) (last visited June 20, 2012).

[10] Emma Schwartz, Controlling Guns in Philadelphia, U.S. News & World Report, March 6, 2008 (available at http://www.usnews.com/articles/news/politics/2008/03/06/controlling-guns-in-philadelphia.html) (last visited June 20, 2012).

[11] Police Executive Research Forum, Gun Violence in America: One Week, Six Cities, and the Implications, 33 (April 26, 2012) (available at http://policeforum.org/library/crime/PERFPresentationonGunViolence.pdf) (last visited June 20, 2012).

[12] Steve Tawa, Philadelphia Closes 2011 with Highest Per Capita Murder Rate in US, Dec. 30, 2011, CBS Local (available at http://philadelphia.cbslocal.com/2011/12/30/philadelphia-closes-2011-with-highest-per-capita-murder-rate-in-u-s/) (last visited June 19, 2012).

[13] See John Duchneskie, Homicide's Deadly Landscape in the City, Phila. Inquirer, Feb. 2, 2011 (available at http://www.philly.com/philly/news/special_packages/inquirer/136746563.html) (last visited June 19, 2012).

The Pennsylvania Commission to Address Gun Violence noted in 2005 that the impact of guns and gun-related violence on the public is enormous: "Pennsylvania loses more than one person per day to gun violence, and three more people are injured every day by firearms."[14] Such violence exacts "a devastating toll" on those who have been shot and their families, and "is a public health problem that impacts on our health delivery system."[15] The cost of gun-related violence is conservatively estimated to be $5 million per homicide, $55,000 per aggravated assault, and $50,000 per armed robbery.[16] Thus, in the last decade, shooting deaths have cost the public nearly $13 billion. Appropriate sentences for firearm offenses, which the government submits the sentencing guidelines recommend, are an indispensable part of the criminal justice system's obligation to help prevent as many of these deaths as possible.

### (4) The need for training, care, or treatment.

While serving an otherwise appropriate sentence, Seals will have the opportunity to take advantage of educational and vocational programs. Medical, mental health, and drug treatment will also be available.

### (5) Policy statements of the Sentencing Commission, and (6) Disparities

The Sentencing Guidelines are intended to achieve uniform and appropriate treatment of like crimes, and they represent a distillation of over 20 years of the careful study of sentencing practices across they country. The Guidelines correlate well to the varying severity of crimes as

---

[14] Commission to Address Gun Violence, Final Report and Recommendations, April 22, 2005, at 7 (available at http://media.philly.com/documents/gun18.pdf) (last visited June 20, 2012).

[15] Id.

[16] RAND Center on Quality Policing, Hidden in Plain Sight – What Cost-of-Crime Research Can Tell Us About Investing in Police, 5 (2010) (available at http://www.rand.org/content/dam/rand/pubs/occasional_papers/2010/RAND_OP279.pdf) (last visited June 20, 2012).

defined in statute by Congress. All of the policy reasons for the Guidelines support the imposition in this case of a sentence within the sentencing guideline range.

**(7) Restitution.**

Restitution is not an issue in this case.

## C. Armed Career Criminal Status

Seals is properly categorized as an armed career criminal based on his three prior state convictions for possession with intent to deliver narcotics. The Court documents for those convictions are attached at Exhibit A, B, C. The conviction detailed in Paragraphs 34 and 35 (CP-51-CR-0504761-2001) of the Pre-Sentence Report is a qualifying conviction for armed career criminal status. The defense contends that the supporting court documents do not indicate that the drug involved was crack cocaine or the charge to which he pled guilty.

In fact, the court documents at Exhibit A do show that Seals pled guilty to possession with intent to deliver a controlled substance and that substance was crack cocaine. The criminal complaint, signed by a bail commissioner, indicated that the acts committed by Seals included that he "unlawfully possessed a controlled substance, to wit, crack cocaine." The information charged Seals with only one count of possession with intent to deliver. Seals pled guilty to that one count.

The fact that Seals was pleading guilty to a charge involving cocaine, and thus to a serious drug offense, is also clear from the "Written Guilty Plea Colloquy" contained in the Quarter Sessions file for the conviction. A copy of the colloquy is attached as Exhibit A, page P10. In the document, which Seals signed, he admits to having committed "PWID" (possession with intent to deliver). Moreover, he acknowledges on this form that he knows he can go to jail

for up to 20 years or be fined $150,000. This statutory maximum is further proof that Seals pled guilty to a drug offense involving crack cocaine. There can be no doubt, based on this record, that Seals pled guilty on September 3, 2002, to a drug offense involving crack cocaine.

The conviction detailed in Paragraphs 38 and 39 (CP-51-CR-1215251-2001) of the report is a qualifying conviction for armed career criminal status. The defense contends that the supporting court documents do not indicate that the drug involved was crack cocaine. In fact, the court documents at Exhibit B do reflect that the defendant pled guilty to possession with intent to deliver crack cocaine. The complaint, which is signed by a bail commissioner, states that the defendant "possessed a controlled substance, to wit crack cocaine" and references no other substance. The information charges the defendant with a single count of possession with intent to deliver and specifically states that the substance was "cocaine base." The docket sheet details Seals' guilty plea to the charge of possession with intent to deliver.

The conviction detailed in Paragraphs 40 and 41 (CP-51-CR-0003944-2008) of the report is a qualifying conviction for armed career criminal status. The defense contends that the court documents do not indicate what charge he pled guilty to or what drug was involved. In fact, the court documents at Exhibit C do show that Seals pled guilty to possession with intent to deliver a controlled substance, and that the drug crack cocaine was involved.

While the complaint refers to both crack cocaine and marijuana, Seals was charged only with regard to the crack cocaine. The information, which is attached as Exhibit C, page P24, reveals that Seals was charged with one count of possession of a controlled substance and one count of possession with intent to deliver a controlled substance. The information specifies, under each count, that the "Drug Description" is "Cocaine." He was not charged with any

offense with regard to the small amount of marijuana found on him. The court document "Trial Disposition and Dismissal Form," which is signed by the judge, notes that Seals pled guilty to Count One, possession with intent to deliver a controlled substance.

To make it perfectly clear that Seals pled guilty to possession with intent to deliver crack cocaine, the government has enclosed a copy of the transcript from Seals' guilty plea hearing on March 20, 2009. During the colloquy, Seals admitted that he had sold crack, that he was charged only with regard to selling crack and not marijuana, and that he was pleading guilty to a charge involving crack cocaine. See Exhibit D, transcript pages 9-10, 13-14. The judge specifically asked Seals, "[T]he facts are enough to support the charges of possession with intent to deliver crack cocaine that you are pleading to today. Do you understand that?" Seals responded, "Yes." See Exhibit D, transcript pages 14-15. Clearly, the court documents reveal that Seals pled guilty to a drug offense involving crack cocaine.

### D. Conclusion.

Seals presents a danger to the community. He engaged in a serious offense by illegally possessing a weapon, and by firing that weapon into a household of innocent bystanders including a young child. His crime falls squarely within the class of cases to which the applicable guidelines are addressed, and thus consideration of the nature of the offense, § 3553(a)(1), counsels in favor of the guideline sentence. It is clear that the recommended term of imprisonment is required "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." § 3553(a)(2). Furthermore, the recommended sentence of incarceration affords adequate deterrence to others who would commit

a similar offense, and protects the public from further crimes of the defendant, for at least as long as he remains incarcerated.

In this case, Seals was arrested with a new, fully operable, semi-automatic firearm. He used that gun to shoot at a man as he tried to escape into an occupied residence. Given Seals' prior criminal history, the nature and circumstances of the case, and the need for deterrence, the government requests that the Court impose a sentence within the guideline range of 262 to 327 months of imprisonment. A sentence within the guidelines is necessary to punish his conduct, to deter him from any further criminal conduct, to deter others from similar conduct, and to protect the community during the time that he is incarcerated.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney

KATHY A. STARK
Chief, Violent Crime and Firearm Section

LAURIE MAGID
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on this date I caused a true and correct copy of the foregoing to be served by served via electronic filing upon:

>Salvatore Adamo
>1434 Knox Avenue, Suite 300
>Easton, PA 18040

I hereby certify that on this date I caused a true and correct copy of the foregoing to be served by served via fax upon:

>Megan Maier
>United States Probation Officer
>Federal Office Building
>Suite 2400
>600 Arch Street
>Philadelphia, PA 19106-1679
>215- 299-4574

LAURIE MAGID<br>
Assistant United States Attorney

Dated: March 8 2013